RULE to show cause why Loxley R. Jacobs should not render compensation to the trustees of the poor of Sussex County for support of his son, Robert C. Jacobs. The Petition to the court on which the rule was granted alleged that by virtue of proper proceedings had, under the provisions of the act of assembly entitled "An Act to provide for the indigent insane of the State of Delaware," passed at Dover, March 29, 1871, Robert C. Jacobs, an indigent insane person and citizen of said county of Sussex, was placed by the proper authorities of this State in the Pennsylvania Hospital for the Insane, an institution located in the State of Pennsylvania. That under and by virtue of the provisions of the second section of said act the governor of the *Page 331 
State, on the 13th day of August, 1879, drew his warrant on the treasurer of the poor of the said county directing him to pay to the order of the Pennsylvania Hospital for the Insane the sum of one hundred and seventy-one dollars and seventy-eight cents in full for board and medical care of the said Robert C. Jacobs, from September 30, 1878, to May 21, 1879; and that in obedience thereto Isaac Connaway, then the treasurer of the poor of said county, and one of your petitioners, paid to the said hospital the said amount. And that the said Robert C. Jacobs is the son of the said defendant, Loxley R. Jacobs, who is possessed of sonsiderable property and is fully able to support him, but neglects and refuses to support him. The prayer of the petition was for a rule on the defendant to show cause why he should not be ordered by the court to make compensation and repay to the plaintiffs the said amount of money so expended by them as aforesaid, and in default thereof wherefore an execution should not issue against him therefor.
On the hearing of the rule the evidence was that the defendant owned and lived on a farm in Northwestfork hundred containing over three hundred acres, and well stocked with horses and cattle, and worth from nine to ten thousand dollars, and clear of debt or incumbrance. His own testimony was to the effect that he had six children, four over twenty-one years of age, the two youngest living at home with him, one of them about twenty and the other fourteen years old. Is sixty-two years of age himself. He clears nothing on his farm and has no investments of any kind or money loaned to any one. Considers himself worth eight thousand dollars.
Robinson for the plaintiffs. The son was sent to and placed in the Pennsylvania institution mentioned as an indigent insane citizen of this county, by the order of the chancellor on an application made to him under the statute for such an order, and whose authority to grant it is not denied or called in question. The only question is whether under the provisions of our statutes on the subject this being an insane son of the defendant without any means of support of his own, who has thus been placed in *Page 332 
the institution and boarded and medically cared for during the period stated at the expense of the trustees of the poor of the county to the amount paid for by them, the defendant, his father, by reason of that relation is bound to repay it to them. Those statutes are based on the broad and comprehensive principle of law that there is an obligation on every man to provide for those descended from his loins; and being so recognized as a matter of fundamental legal obligation, statutes were early enacted both in England and in this country to provide the manner in which this obligation shall be performed towards their indigent and impotent offspring. 1 Black. Com., 235, 360, 361, 365; 2 Kent's Com., 190; 66 Pa., 18. The Pennsylvania statute provides for the liability of the father for the support of an adult indigent son, if of sufficient ability, but on the question of the ability of the father to support the son in this case our statute omits the words, "if of sufficient ability," which are also contained in the English statute.
Richards for the defendant. Our statute fixing the liability of a father for the support of an adult indigent son does not apply to any indigent or poor persons, except such as are in the almshouse of the county, or are supported by the county as outside poor, to neither of which class of indigent persons does the son of the defendant belong. 2 Kent's Com., 190, 191; Ld. Raym., 699; 7 Hill, 171.
Chap. 48, § 23 of the later statute under which the son in this case was placed pursuant to the order of the chancellor in the Pennsylvania Hospital for the Insane, is inconsistent with the former statute, and so far as it is inconsistent with the former statute it repeals it, and it must be so construed. Sedw. on Stat., Cons., 124; 16 Barb., 15; 21 Pick., 373. And now as to the question of the ability of the father to support the idigent and insane son in this case. The evidence clearly shows that his annual income from all he owns is scarcely adequate to the support of his family, and that it would be impossible for him with such an income to support in addition to his family his unfortunate son at that institution. *Page 333 
 John H. Paynter for the defendant. This is not a case that arises under "the Poor Laws of the State," as they are termed, but under a later statute, the act of 1871, having relation specially to indigent insane persons in the State. The recent act was only intended to aid and assist the parent of an indigent adult son in his support and maintenance in the hospital mentioned, because the sum limited in the act for the purpose is wholly inadequate, and was well known to be when the act was passed, to defray the whole expense of it per month or per annum, it costing the defendant in addition to the amount paid by the treasurer of the poor on the bill presented, the sum of one hundred and fourteen dollars per annum, and the entire expense of his clothing besides. The county, under the act, pays in all only two hundred and fifty dollars per annum towards his expenses there, his father the balance.
The Court at the next term discharged the rule.
Houston, J., dissented, and in the meantime had prepared his opinion to the contrary.
There is no question in this case as to the authority of the chancellor to recommend to the governor to remove the said Robert C. Jacobs, an adult son of the defendant and an indigent insane citizen of this county, to the Pennsylvania Hospital for the Insane, under the provisions of the act referred to, chap. 57 of the statutes of the State; but it is contended by the counsel for the plaintiffs, and denied by the counsel for the defendant, that this proceeding to compel the defendant, his father, to reimburse to the tresaurer of the poor of the county the bill of expenses paid by him for his maintenance and proper medical treatment in it by the order of the said trustees, is warranted by a proper consideration and construction of the provisions of that act. That it contemplates and provides for the removal on the order of the chancellor in the *Page 334 
manner designated in it, and maintenance in that institution of not exceeding five indigent insane persons from each of the counties of the State at any one time, at the expense of the respective poor treasuries thereof, provided that expense in no case exceeds two hundred and fifty dollars per annum, is evident, we think, from the phraseology of the first and second sections of it; but by the provisions of the sixth section of it, if any one of this limited number of indigent insane persons thus to be removed to and maintained in it at the public expense solely of the county of his residence, shall become possessed of sufficient properly for his support there, the chancellor is to appoint a trustee to take charge of it for that purpose, and may, in his discretion, require such insane person to be retained in the institution at his own proper cost and expense; and such a proceeding in the premises is to create a vacancy in it in favor of the county from which such insane person was removed to it. By the terms of this statute, however, such an indigent insane person as is therein provided for can only be removed to the institution on the recommendation of the chancellor alone, upon the application of his relatives or friends, supported by the certificate of two practicing physicians of the county of his residence, stating such insanity, the cause or causes thereof, if known, and the necessity, in their opinion, of a better and more efficient mode of medical treatment in such case than can be afforded in the almshouse of the county, and on satisfactory proof before him of such insanity and such indigency. But prior to and at the time of the passage of this act, chapter 48 of the revised statutes, which contains our general law concerning almshouses and the public maintenance of the poor, provided, and still provides, in the twenty-third section of it, as follows: "The trustees of the poor of the several counties are required, on the recommendation of the chancellor and the resident associate judge in either county, to cause any of the insane poor of their county, whether in or out of the almshouse, to be removed to any hospital, asylum, or institution for the insane in the United States, and for this purpose to make contracts with such institution for admission into the same; and the said trustees are authorized *Page 335 
to defray, in whole or part, the expenses of such removal, and of the keeping and supporting of the person so removed in such institution so long as they may judge proper to do so. Such expenses shall be provided for and borne as other poor charges." While the fourteenth section of it provides as follows: "When any poor person shall be unable to support himself, his parents, grandparents, children or grandchildren shall be liable for his support in that order; if the relation prior in order shall not be able, the next in order shall be liable. Several relations of the same order shall, if able, contribute equally; and in case of neglect to provide such support, the Superior Court shall have power to order such relations to pay to the treasurer of the poor of the proper county, for such poor person's support, a reasonable monthly sum, and to award execution as upon judgments in that court, to levy such sum, or, in case expense has been incurred by said trustees, to order the relations who were laible to provide for such person's support, to make `compensation, and to issue execution as aforesaid." Whilst it further provides with special reference to the insane poor in the twenty-second section of it, that "If any insane person supported in the almshouse, or for whom the trustees of the poor shall be at any expense, shall have any real or personal property, the said trustees may, from time to time, present their account and petition for reimbusrement to the Superior Court, and the said court, upon hearing the case in a summary way, shall enter judgment for such sum as will reimburse such expenses, which judgment shall, from its date, be a lien, as other judgments of said court, and may be executed in the same way," etc. And then follow in this same section several subordinate provisions for the levy of the execution and the application of the moneys arising therefrom to reimburse the expenses incurred for such insane person, and which section, when fully considered in all of its provisions, clearly shows that the legislature designed to include and embrace in the provisions of the fourteenth section of it the special class known as the indigent insane with the poor generally of the country, and to place them on the same basis so far as it refers to the liability of the relations *Page 336 
specified for their support, if able, the order of their liability, and the power of the Superior Court in case of their neglect to provide such support, if able, to order such relations to pay to the treasurer of the poor of the proper county for such indigent insane or poor person's support, a reasonable monthly sum, and to award execution, as upon judgments in that court, to levy such sum; or, in case expense has been incurred by said trustees, to order the relations who were liable to provide for such person's support, to make compensation to them and to issue execution therefor as aforesaid. Because the terms employed in the fourteenth section, "any poor person," are general, of course, and include all poor persons of every kind or class, the insane as well as the rational. And, as we have before remarked, the words "any insane person" employed in the twenty-second section only the more clearly show that such was the meaning of the legislature in enacting the statute. The first of those sections on which we have been commenting provides generally that when any poor person shall be unable to support himself, his parents, grandparents, children or grandchildren shall be liable for his support in that order and in the manner mentioned, if able, and in case of their neglect to provide for his support, the Superior Court shall have power to order such relations to pay to the treasurer of the poor of his county for his support such monthly sum as the court shall deem reasonable, and to award execution, as upon judgments in that court, to levy such sum; or, in case expense has been incurred by the trustees of the poor of the county for his support, to order the relation or relations who were liable for it to make compensation for such expense, and to issue execution as aforesaid, whilst the latter of those sections makes a special provision that in case of any insane person supported in the almshouse, or for whom the trustees of the poor of the county shall be at any expense, without his having been committed to the almshouse, shall have any property, for the reimbursement of such expense to them on application to that court, and to which it gives full powers for that purpose.
But the seventh and last section of the subsequent statute, or chap. 57, expressly provides in the following words: "That *Page 337 
nothing contained in this act shall be construed a repeal in whole or in part, or as in any wise affecting the existence or force of § 23 of chap. 48 of the Revised Statutes of Delaware concerning the transfer of the insane poor to any asylum, hospital or institution for the insane within the United States; but the said section shall be taken to be concurrent and co-existent with this act." The language here employed clearly indicates a very earnest and decided intention, not only to prevent any implied or constructive repeal of the twenty-third section of chapter 48 of the Revised Statutes, but to re-enact and incorporate it in this act, as a subsisting part of it. The twenty-third section of chapter 48 we have already set forth at length, and as thus adopted and made a part of this subsequent act, which confers on the chancellor alone, upon the application of the relatives and friends of any indigent lunatic or insane person, the authority to recommend to the governor his removal to such asylum, hospital, or institution for the insane in the State of Pennsylvania which the latter may select, as provided for in it, the twenty-third section of chapter 48 is to be construed as applicable to this case, with the modifications necessarily introduced into it in adapting it to this particular case, so far as the provisions of the two statutes are consistent and compatible, and can stand together without conflicting with each other. And so far as this case is concerned we cannot perceive that the provisions of the fourteenth section of chapter 48, making the defendant, as the father of the indigent insane person, liable for the expenses in question, if he is able to pay them, are inconsistent or irreconcilable with anything contained in chapter 57, or that there is anthing in the provisions of the twenty-third section of chapter 48 which is necessarily inconsistent and irreconcilable, as far as they go, with the provisions of chapter 57, except that the latter are more special and specific in their character and application, whilst the removal of an indigent insane person under it to an institution for the insane out of the States, is to be procured through the recommendation of the chancellor alone, in lieu of the recommendation of the chancellor and the resident associate judge of the county conjointly, under the provision of the twenty-third *Page 338 
section of chapter 48. The two chapters in point off act merely provide two distinct and separate methods of procuring such a removal of an indigent insane person to be maintained at a suitable institution out of the State at the expense of the poor establishment of his county, and the statutory provisions of the two are therefore concurrent and still subsisting in the respective cases to which by their terms they are made applicable.
But whilst the legislature did not repeal, or mean to repeal any provision contained in chapter 48 by the anactment of chapter 57, we think it manifestly appears from the seventh and final section of that chapter, that it particularly intended that the expenses incurred by the trustees of the county in any case arising under that chapter, should be "provided for and borne as other poor charges," and which, of course, means as such poor expenses are provided for in chapter 48, pursuant to the final clause of the twenty-third section of it which is as follows: "Such expenses shall be provided for and borne as other poor charges." And which in their original connection had relation only to the expenses incurred by the trustees of the poor of the county in the removal, keeping and support of any insane poor person in such an institution out of the State, under the provisions of the twenty-third section of chapter 48. And for which expenses, as well as "other poor charges" incurred by the trustees of the county for the support of any poor person in or out of the almshouse of it, the relations mentioned are made expressly liable to reimburse to them if able, by the fourteenth section of the 48th chapter in the manner provided in it, as we have before shown. In the interpretation and construction which we have thus given to the provisions of the two statutes or chapters referred to, there is no inconsistency or conflict between them in their application to this case, and therefore the objection taken to it by the counsel for the defendant on that ground is not sustained.
The other ground of objection taken to it by them was that it appears from the evidence in the case that the defendant is not able to bear the expense of his unfortunate son's support and medical treatment at the institution in question, in relation to which the proof was that he is possessed in fee simple of an unencumbered *Page 339 
farm of three hundred acres in Northwestfork hundred variously estimated by the witnesses to be worth from eight thousand to ten thousand dollars, which with the stock and agricultural implements and other goods and chattels on it constitutes his only wealth, and although entirely free of debt, the annual receipts from it after deducting the expenses on it, which constitutes his only income, is not more than sufficient to defray the necessary annual expenses of his family without adding to it the expense of supporting his afflicted son in the institution mentioned. Although the language of our statute on this point is not as direct and explicit as the language of the Pennsylvania, or the New York, or the English statute on the same point, yet we think it clearly imports and requires that it must appear to the satisfaction of the court in this case that the defendant is able to support his son in the institution and to reimburse the plaintiffs the expenses incurred by them for it, and now demanded of him in this proceeding, before we would be warranted in holding him liable for them. But the question here arises by what standard or criterion is the ability of the defendant to pay the expense in question incurred by the plaintiffs for the support of his adult, indigent and insane son in the Pennsylvania Hospital for the Insane under the facts and circumstances of this case, to be measured and ascertained? By the measure and amount of his net annual income, or by the measure and amount of property and wealth actually owned and possessed by him, and clear of all incumbrances or indebtedness on his part? The counsel for the defendant have assumed that it is to be ascertained and determined by the amount of his clear annual income exclusively, and have argued the question on that ground solely. But they have produced no authority to sustain it, and we are not aware of any case, American or English, in which it has been so ruled or recognized, or has ever before been so claimed or contended for even in the argument of it. In the contemplation of our statute the liability of the defendant to pay this bill of expense for the support of his son under the circumstances, seems to be placed on the ground of a legal indebtedness against him in case he is able to pay it, and if recovered in this proceeding is by virtue *Page 340 
of an express provision of it to have the effect of a judgment obtained in this court, and to be executed as such. And no legal liability or indebtedness of any kind depends in law on the ability of the debtor to pay it out of his income merely, or is recoverable out of it exclusively, but out of the property, real and personal, of the debtor, if he has any, unless it is so expressly provided by the statute, or stipulated in the agreement or obligation creating it.